[No. 30287. *En Banc.* December 29, 1947.]

JOHN L. CARUTHERS *et al., Respondents and Cross-appellants,* v. SUNNYSIDE VALLEY IRRIGATION DISTRICT *et al., Appellants.*[1]

[1]Reported in 188 P. (2d) 136.

*Stephen E. Chaffee,* for appellants.

*Clark & Grady* and *Thomas E. Grady, Jr.,* for respondents and cross-appellants.

SCHWELLENBACH, J.—This is an appeal from a declaratory judgment and decree, holding that certain landowners and water users under the Sunnyside canal are entitled to water for a charge of one dollar per acre per year, or less, to defray the costs of operation and maintenance, and enjoining the the Sunnyside Valley Irrigation District from assessing such lands, during the year 1947 and subsequent years, for any sum in excess of one dollar per acre for such maintenance and operation. There is also a cross-appeal from that portion of the decree holding that certain other landowners and water users, who acquired supplemental water rights by contract with the United States, subsequent to August 13, 1914, who obtain in excess of one cubic foot of water per second, are subject to assessments for operation and maintenance in the manner and on the basis provided and prescribed by law.

In 1890, the Northern Pacific, Yakima and Kittitas Irrigation Company appropriated water from the Yakima river to irrigate lands now included within the appellant district. On June 1, 1893, the company deeded section 19, township 10 north, range 23 E. W. M., to Edwin N. Castillo. Mr. Castillo thereby became a predecessor in interest to the Caruthers, who now own a portion of section 19. The deed also conveyed the right to receive from the grantor water for the irrigation of the tract conveyed, in the amount of one

cubic foot of water per second of time for each one hundred sixty acres of land conveyed. (The parties have stipulated that this amounts to 2.62 acre feet per annum.) The deed provided:

"The said irrigation water supply hereby agreed to be furnished by the party of the first part shall be in total amount the equivalent of a continuous flow during the said irrigation season of one-sixteenth of one cubic foot of water per second of time for each ten acres of said described land, or fraction thereof in proportion; or, for the total acreage above stated, the equivalent of the continuous flow of four (4) cubic feet of water per second of time for the said irrigation period, the said water to be furnished at the time, place and in the manner, and upon the terms and conditions, expressed in the certain water-right agreement relating to said land, made and entered into between the parties hereto at the date hereof, which said agreement and each and every of the covenants, terms and conditions thereof, are hereby referred to and expressly made a part of this deed."

The water-right agreement, executed at the same time and as a part of the same transaction, provided:

" . . . has bargained, sold, and conveyed, and by these presents does bargain, sell and convey unto the Purchaser the perpetual right to the use of the water from the Main Canal of the Irrigation Company, known as the Yakima-Sunnyside Canal, in the County of Yakima, State of Washington, or from a branch thereof, for the purpose of irrigating the following described tract or parcel of land situate in Yakima County, State of Washington. [Here follows description of the land] . . . and for domestic purposes incident thereto, between the first day of April and the last day of October of each year, Provided, However, that the quantity of water so to be used by the Purchaser shall not exceed one cubic foot of water per second of time for each one hundred and sixty acres . . . That the Purchaser shall pay annually, and in advance to the Irrigation Company at its office, in gold coin of the United States, on the first Monday of May in each year, from the date hereof, the sum of Six Hundred and Forty Dollars, being at the rate of One Dollar per acre, . . . That the water right hereby conveyed, and any certificate or evidence thereof is not personal property but is a part of the appurtenances of the land herein described and the right thereto shall be transferable

only with said land, and all the covenants, herein contained to be performed by the Purchaser shall run with and bind the land. . . . That all covenants, terms and conditions hereinbefore mentioned shall inure to the benefit of, extend to and be binding upon the heirs, executors, administrators, grantees, successors and assigns of the parties hereto."

It will thus be seen that, although the purchaser was only obligated to pay one dollar per acre per year, he was only entitled to an amount not to exceed one cubic foot of water per second for each one hundred sixty acres.

On June 7, 1893, the Northern Pacific company conveyed certain lands, together with its water rights and appropriations from the Yakima river, to the Yakima Investment Company. On July 8, 1893, the Yakima Investment Company conveyed to S. Farnsworth, the then owner of section 19, a supplemental water right for said section.

While the Yakima Investment Company was the owner of the lands and water rights formerly owned by the Northern Pacific company, it granted a mortgage thereon, and this mortgage was in due time foreclosed. J. Dalzell Brown became the purchaser at the foreclosure sale, and he thereafter, on July 11, 1900, conveyed his interest to the Washington Irrigation Company. When the mortgage foreclosure action against the Yakima Investment Company was pending in the circuit court of the United States, S. Farnsworth, the then owner of section 19, intervened in the action and, as a result thereof, obtained a decree of that court which contained, *inter alia*, the following provisions:

(1) that the landowner had the right to obtain water from the investment company for one dollar per acre per annum;

(2) that the landowner should not be required to pay for the delivery of water more than one dollar per acre per annum;

(3) that the water was appurtenant to the land and that the covenants of the agreement between the parties should run with and bind the land;

(4) that the covenants, terms, and conditions expressed in the agreement should inure to the benefit of, extend

to, and be binding upon, the heirs, executors, administrators, grantees, successors, and assigns of the parties;

(5) that the quantity of water to be furnished by the irrigation company, and to be used by Farnsworth, his successors and assigns, should not exceed one fourth of one cubic foot of water per second for each forty acres for the irrigation period of each year.

On October 23, 1905, the Washington Irrigation Company gave to the United States of America an option to purchase the irrigation system. On June 23, 1906, the Washington Irrigation Company deeded the canal, water appropriations and irrigation system to the United States. It was agreed, in the contract, that the Washington Irrigation Company was to retain nine thousand acres, to which the United States agreed to furnish water, when called upon, for an operation and maintenance charge of one dollar per acre per year. The deed further provided:

"It is Further Understood and Agreed that upon the payment of the annual maintenance fee of one (1) dollar per acre, the United States shall, when called upon furnish water at the rate of one (1) cubic foot per second of time for each one hundred sixty (160) acres of the nine thousand (9000) acres of land above referred to, and also to the other lands lying under the Sunnyside Canal and having a right to water by virtue of contracts of the Washington Irrigation Company or its predecessors in interest upon the terms in said contracts mentioned."

After the United States purchased the Sunnyside canal and project, it operated and maintained the same and carried out and performed all contracts and covenants of the Washington Irrigation Company and its predecessors, as to the furnishing and charges for water supplied. As time went on, and the lands within the district came into fuller use and more intensive cultivation, it became apparent in many instances that the 2.62 acre feet, originally allowed, was insufficient for the full beneficial use thereof; because of this, the United States improved its works and made more water available. It then entered into supplemental water right contracts with various landowners who desired additional water. The contracts provided:

"WHEREAS, The contractor has heretofore entered into contract with the Washington Irrigation Company for water for irrigation for the following described lands, to-wit: [here follows description of the land]; and;

"WHEREAS, A condition of said contract is that the amount of water to be furnished for said lands shall not exceed one cubic foot of water per second for each 160 acres; and

"WHEREAS, The contractor desires to obtain the benefits of the storage connected with the Sunnyside project, the benefits of the better distribution of the water supply through the irrigation season, the benefits derived from the enlargement and improvement of the present Sunnyside irrigation system, an increased water supply over the existing contract allowance, an eventual reduction of maintenance charges when the improved system is completed or within a period not exceeding five years, and the better security of operation and facilities afforded for draining wet lands through the construction of wasteways."

It was then agreed that the owner would pay the United States the sum of ten dollars per acre (to be paid in five annual installments) for such benefits. The contracts further provided:

"The contractor further agrees to pay to the Special Fiscal Agent, or other proper officer, the annual operation and maintenance charges hereafter assessed by the Secretary of the Interior against like lands in the project on or before the date when the same shall be due, not to exceed One Dollar ($1.00) per acre. . . . The amount of water to be furnished hereunder shall be three acre-feet of water per annum per acre measured at the land, or as much more water as will be required to successfully irrigate the land, the amount so required to be determined by the authorized agent of the United States, and the water shall be used only to irrigate said lands and for domestic purposes incident thereto; Provided, that the amount of water furnished shall be limited to the amount beneficially used upon such lands."

Since a determination of the amounts necessary to successfully irrigate the various tracts of "Old Supplemental Lands" had never been made by an authorized agent of the department of the interior, as provided in these contracts, one W. W. Johnston was appointed by the department for that purpose in the year 1931, and he thereafter

determined the amounts of water to which each "Old Supplemental" water user was entitled in order to successfully irrigate his land. This fixing of the amounts to which those lands were respectively entitled is known as the "Johnston Determination."

On August 13, 1914, Congress adopted the reclamation extension act. Section 5 of that act provided:

"In addition to the construction charge, every water-right applicant, entryman, or landowner under or upon a reclamation project shall also pay, whenever water service is available for the irrigation of his land, an operation and maintenance charge based upon the total cost of operation and maintenance of the project, or each separate unit thereof, and such charge shall be made for each acre-foot of water delivered; but each acre of irrigable land, whether irrigated or not, shall be charged with a minimum operation and maintenance charge based upon the charge for delivery of not less than one acre-foot of water. If the total amount of operation and maintenance charges and penalties collected for any one irrigation season on any project shall exceed the cost of operation and maintenance of the project during that irrigation season, the balance shall be applied to a reduction of the charge on the project for the next irrigation season, and any deficit incurred may likewise be added to the charge for the next irrigation season." 43 U.S.C.A. 340, § 492.

However, supplemental water right contracts, similar to the one mentioned above, and with identical provisions, were entered into by the United States, both prior and subsequent to the enactment of the reclamation extension act of August 13, 1914.

Various other water rights were granted to owners within the district, and as a result, the lands within the district have fallen within certain groups or classifications, according to the types of water rights which are appurtenant to them, and the manner in which those rights were obtained. The first of these groups is called "Old W. I. Lands" and comprises 6,425 acres. These are lands which were sold prior to the time that the United States acquired the irrigation project, each of which had an appurtenant water

right of 2.62 acre feet and which have obtained no supplemental water right.

A second classification is called, "Old Supplemental Lands," and comprises 28,549 acres. These are lands which were sold to private owners prior to the time the United States purchased the irrigation project, and which had the original water right of 2.62 acre feet. In addition, they had obtained what is known as an "Old Supplemental Water Right," which entitled them to three acre feet of water per annum per acre,

". . . or as much more water as will be required to successfully irrigate the land, the amount so required to be determined by the authorized agent of the United States, and the water shall be used only to irrigate said lands and for domestic purposes incident thereto, provided that the amount of water furnished shall be limited to the amount beneficially used upon said lands."

It was further provided, in such old supplemental water contracts, that the landowner should pay the annual operation and maintenance charges assessed by the secretary of the interior against like lands in the project, "not to exceed One Dollar per acre."

Certain other lands within the district, comprising a total of 5,013 acres, are known as "Special Supplemental Lands" and are those lands which were sold prior to the time the United States purchased the irrigation project. These lands possessed, in addition to the original water right of 2.62 acre feet per acre per year, a special supplemental water right, which entitled them to obtain water from the irrigation project to the extent of three acre feet per annum per acre. These special supplemental water right contracts also contained a provision to the effect that the landowner should pay an annual operation and maintenance charge of "not to exceed One Dollar per acre."

It will be noted that the total acreage included in the "Old W. I. Lands," the "Old Supplemental Lands," and the "Special Supplemental Lands" is 39,987 acres, or in round numbers about forty thousand acres. These are the lands represented by the respondents and cross-appellants. The

total acreage of the lands included within the district is approximately seventy-five thousand acres.

After the United States acquired the Sunnyside canal from the Washington Irrigation Company, the secretary of the interior caused the canal to be enlarged and extended so as to reclaim and put under irrigation an acreage of approximately thirty-five thousand acres of arid lands. The owners of such lands contracted with the United States to pay a fixed charge per acre of land for the construction of water storage facilities and other construction costs and an appurtenant water right for their lands; and annual charges and assessments were made and fixed by the secretary of the interior each year by the promulgation and issuance of a public notice, and the amount thereof usually exceeded one dollar per acre of land. The lands became known as "Public Notice" lands, the acreage of which consists of approximately 29,900 acres, "Warren Act" lands consisting of approximately 3,758 acres, and "New Supplemental" lands consisting of approximately 2,237 acres. These lands are represented in this action by the interveners.

Prior to 1930, and during all of the years that the Sunnyside project was owned and operated by the United States, it made an annual operation and maintenance charge against the "Old W. I. Lands," the "Old Supplemental Lands," and "Special Supplemental Lands," of not to exceed one dollar per acre. The amount of the operation and maintenance assessment to be charged against the "Public Notice" lands was fixed from year to year by a public notice promulgated by the secretary of the interior, and was usually fixed at an amount greater than one dollar per acre. On October 17, 1930, the secretary of the interior issued a public notice, by the terms of which the water rights of all the land owners within the district, with the exception of the "Old Supplemental Lands," were limited to three acre feet per annum, with a proviso that in the event there was a larger amount of water available, not required for other lands, then and in that event a water user could rent additional water at the rate to be fixed by the secretary of the

interior. As to the "Old Supplemental Lands," this public notice also applied as to any water which might be used by them in excess of three acre feet, "or as much more as will be required to successfully irrigate the land."

After the public notice of October 17, 1930, a controversy arose between the government and certain water users within the district, which finally culminated in decisions in the case of *Fox v. Ickes* in the United States court of appeals, 137 F. (2d) 30, and in *Ickes v. Fox* in the supreme court of the United States, 300 U. S. 82, 81 L. Ed. 525, 57 S. Ct. 412. In this case, it was held that the basis and extent of the water user's right to have water from the district was to be measured by the amount necessary for the beneficial use of his land. After these judicial determinations of the matter, the government made no further attempt to charge the "Old W. I. Lands," the "Old Supplemental Lands," or the "Special Supplemental Lands" more than one dollar per acre as an annual operation and maintenance charge.

In the year 1945, the United States conveyed to the appellant district the Sunnyside canal and its appurtenant works; and since that time the appellant district has operated this irrigation project. The conveyance contract provided:

"The Board in the operation and maintenance of the transferred works and delivery of water therefrom, and the District in the operation and maintenance of the Sunnyside Valley works and delivery of water therefrom, shall carry out all project contracts of whatsoever kind or nature, now or hereafter in force, affecting in any manner the transferred works or the Sunnyside Valley works or the delivery of water therefrom; and shall fulfill all obligations imposed upon the United States therein."

In the fall of 1945, the board of directors of the irrigation district levied its assessments for the ensuing year; and in so doing fixed an operation and maintenance charge against all of the lands of the district in an amount in excess of one dollar per acre. After such assessment was made and became known to the respondents and other owners of the forty thousand acres of "Old W. I.," "Old Supplemental," and

"Special Supplemental" lands, they brought this action on their own behalf and on behalf of the other landowners similarly situated, seeking a judicial determination that the appellant district was contractually bound to furnish water to all of said lands at an annual operation and maintenance charge no greater than one dollar per acre. The interveners, representing the other approximately thirty-five thousand acres of land in the district (the public notice lands), intervened, contending that all the lands within the district should be similarly assessed for operation and maintenance, and that the board of directors of the defendant district acted properly in fixing such assessments in a similar amount as to all lands, even though such charge exceeded one dollar per acre.

After a trial, the judgment and decree was rendered as heretofore announced.

As to "Old W. I. Lands," comprising 6,425 acres, "Old Supplemental Lands," comprising 28,549 acres, and "Special Supplemental Lands," comprising 5,013 acres, we have this situation. The lands were originally sold under an obligation of the company to furnish not to exceed one cubic foot of water per second for each 160 acres, for which the purchaser was obligated to pay one dollar per acre per year. This obligation was appurtenant to the land, and the covenants of the agreement, ran with and bound the land.

When the United States took over the project in 1905, it adopted and agreed to be bound by the foregoing agreements. The United States was not obligated to furnish in excess of one foot of water per second for an operation and maintenance charge of one dollar per acre per year. Nevertheless, there was nothing to prevent it (prior to the enactment of the reclamation extension act of August 13, 1914) from entering into contracts with individual landowners to furnish more than one foot of water per second for an agreed operation and maintenance charge of one dollar per acre per year. Those became valid and subsisting contracts.

When the district acquired the project from the United States in 1945, it promised to fulfill all obligations imposed

upon the United States by contract. The district, therefore, had no right to assess more than one dollar per acre per year as an operation and maintenance charge against any landowner holding as an heir or assign under an original contract with the Washington Irrigation company or its predecessors, receiving not to exceed one foot of water per second for each 160 acres; nor against those having a valid and subsisting contract with the United States, made prior to August 13, 1914, to receive more than one foot of water per second for a charge of one dollar per acre per year.

■ Appellant contends that Congress never authorized the secretary of the interior to write a supplemental water right contract limiting operation and maintenance charges to one dollar per acre, basing this contention on the reclamation act of 1902 (32 Stat. 388), § 5 of the reclamation extension act (43 U.S.C.A. 439 [heretofore quoted]), and § 2 of the act of August 11, 1916 (43 U.S.C.A. 622), which provided:

"The cost of constructing, acquiring, purchasing, or maintaining the canals, ditches, reservoirs, reservoir sites, water, water right, rights of way, or other property incurred in connection with any irrigation project under said irrigation district laws shall be equitably apportioned among lands held under private ownership, lands legally covered by unpatented entries, and unentered public lands included in said irrigation district. . . ."

Appellant states that the measure of respondent's water right was construed by the supreme court of the United States in *Ickes v. Fox, supra,* as:

". . . beneficial use shall be the basis, the measure, and the limit of the right."

However, that case, decided in 1937, interpreted the reclamation act of June 17, 1902, *as amended.* We find nothing in the reclamation act of 1902 basing the charge for operation and maintenance upon beneficial use. Until the enactment of the reclamation extension act, on August 13, 1914, there was, therefore, nothing in the law to prevent the secretary of the interior from entering into the supplemental water right contracts.

In *Evans v. Prosser Falls Land & Power Co.,* 62 Wash. 178, 113 Pac. 271, this court recognized the contractual rights to water of an owner against the successor in interest of the original grantor. True, that case involved the rights of a grantee as against a private corporation, but the deeds there were almost identical, as to their terms, with the deeds in this case. We there held that the successor in interest of the original grantor was required to furnish the maximum quantity of water required by its contract.

In *Tedford v. Wenatchee Reclamation Dist.,* 127 Wash. 495, 221 Pac. 328, the predecessors in interest were the owners of a water right in Settlers Ditch, by virtue of a contract with the Wenatchee Canal Company. In 1907, the land involved, together with the water right, was sold to appellants. In 1916, the canal company transferred its entire property to the reclamation district, subject to existing rights of water users and water deed holders. In holding that appellants were entitled to this water, we said:

"A water right is real property appurtenant to, and passes with a conveyance of, the land. *Geddis v. Parrish,* 1 Wash. 587, 21 Pac. 314. Appellants purchased from their predecessors in interest not only the fee to the lands described, but also their right to the use of water then appurtenant to the land."

*Reeves v. Pecos County Water Improvement Dist. No. 1,* 299 S. W. (Tex. Com. App.) 224, was an action to restrain the defendant, a municipal corporation, organized under the laws of Texas, for irrigation purposes, from diverting water from certain blocks of land owned by plaintiffs, and on which they had a deed from the grantor of the improvement district which provided: " ' . . . that grantee will not contract water nor apply water during the irrigation season upon any lands outside of blocks 1 and 2 and block A.' " A demurrer to the petition was sustained, and the judgment was affirmed by the court of civil appeals for the eighth district. In reversing that decision, the Texas court said:

"The Court of Civil Appeals has said:

" 'The water rights secured to plaintiffs, as pleaded, are contract rights, are easements carved out of the fee simple of the irrigation system attached to the respective tracts of the water district and appurtenant thereto and a part thereof from the date of their several deeds conveying said water rights, and are covenants running with the lands and in the nature of real estate'—citing *Edinburg Irrigation Co. v. Paschen* (Tex. Civ. App.) 223 S. W. 329; Id. (Tex. Com. App.) 235 S. W. 1088.'

"After discussing other matters, that court proceeds as follows:

" 'However that may be, we prefer to rest our holding as to the sufficiency of the petition upon what we conceive to be the rights of all the parties under the several matters pleaded and the law regulating the use of water for irrigation in water improvement districts in this state,' and thus states the question for decision:

" 'If the water improvement district may not, by reason of the several restrictions referred to, convey water to lands outside of blocks 1, 2, and A, and if the plaintiffs, by reason of being owners of water righted lands in blocks 1, 2, and A, can enjoin the district from enlarging its territory so as to include other lands outside of blocks 1, 2, and A, we think the petition not subject to the general demurrer.'

"That court then decides that our statutes, title 128 (Tex. Civ. Stat. 1925) are applicable and controlling, and have the effect to permit the water improvement district to do the very thing sought to be enjoined herein, saying:

" 'We have concluded that a contract for water, to be performed under the law for the distribution of water, may not contravene the law, but must conform to the purposes and provisions of the law for water distribution.'

"The abstract proposition of law is of course faultless. A contract cannot impair the validity or force of any law. It is no less true that a statute cannot impair the obligations of an existing contract. By the express provision of the act referred to it is said: 'Nothing in this chapter shall prejudice vested private rights.' Article 7469. But if it were not so, the result would be the same, for by fundamental law of the land, such rights may not be destroyed by legislative act. If we are to accept the allegations of the petition as true, and we must, then the plaintiffs were the owners of valuable water rights prior to the enactment of the statutes

invoked, and these rights are threatened with impairment or destruction. The statute cannot possibly stand in the way of their protection."

*Knowles v. New Sweden Irr. Dist.,* 16 Idaho 217, 101 Pac. 81, is a case involving facts quite similar to those of the case at bar. In 1891, the Great Western Canal Construction Company constructed the "Great Western Canal." The following year, the predecessor in interest of the plaintiffs purchased from the company a water right of 250 inches of water per second of time, for which he paid the sum of one thousand eight hundred dollars and procured a deed for the same. The deed provided that the purchaser would pay an annual rental for the use of the water for irrigation, the sum of one dollar per acre for all crops and trees for the number of acres actually irrigated in any given year. On January 15, 1900, the irrigation district was organized, and on March 1, 1900, the district purchased the Great Western Canal System. The district began levying annual assessments for the purpose of paying the interest and reducing the principal on the bonds, and for improving the system and maintenance thereof. In holding that the district could not assess the plaintiffs' lands in excess of one dollar per acre for the amount of land. actually irrigated, the court said:

"It seems to us that this question may be simplified by briefly stating some fundamental principles that must necessarily arise in the consideration of this matter and upon which its correct determination must necessarily rest. In the first place, appellant's predecessor in interest, Scott, had a clear and undisputed right to contract with the Great Western Canal Construction Company for the purchase of a water right sufficient to irrigate his tract of land. This he did, and for that right he paid $1,800. Under it he and his successors in interest were entitled to the perpetual use of water sufficient to irrigate his tract of land, not exceeding 250 inches per second, upon paying the fixed and stipulated price of $1 per acre as rental therefor. Under the laws of this state a water right is real estate. (Sec. 2825, Rev. Stat.; *Ada Co. etc. Co. v. Farmers' etc. Co.,* 5 Ida. 799, 51 Pac. 990, 40 L. R. A. 485; *McGinnis v. Stanfield,* 6 Ida. 372, 55 Pac.

1020; *Hall v. Blackman*, 8 Ida. 272, 68 Pac. 19.) The conveyance of this property, having been made a matter of record, became notice to subsequent purchasers from the Great Western Canal Construction Company. The respondent, New Sweden Irrigation District, had a right to organize itself into a quasi-municipal corporation for the purpose of purchasing, acquiring or constructing canals, ditches, water rights and a canal system. This it has done. It had a right to purchase the Great Western Canal system, and the Great Western Canal Construction Company had a right to sell this property. The irrigation district having the right and capacity to purchase, and the canal company having the property and the right to dispose of the same, the latter could lawfully sell to the irrigation district, which it has done. The canal company could not sell any greater title than it possessed, and when the irrigation district purchased, it could neither purchase nor acquire any greater title or interest than its grantor owned and possessed. When it purchased this canal system, it purchased it subject to and burdened with the rights and equities of the appellant's grantor."

However, on rehearing, the court reversed itself and held that it was the duty of a landowner having a contractual right to appear before the court at the hearing held to confirm the proceedings for the formation of the district and there have his rights protected, and that all matters which could have been determined at that hearing became *res judicata*.

Such a ruling could not be given in this state, because here contractual rights are protected. Rem. Rev. Stat. (Sup.), § 7436 [P.P.C. § 679-69], provides:

"Assessments made in order to carry out the purpose of this act shall be made in proportion to the benefits accruing to the lands assessed and equitable credit shall be given to the lands having a partial or full water right: *Provided,* That nothing herein shall be construed to affect or impair the obligation of any existing contract providing for a water supply to lands so assessed, unless the right under such contract shall first have been acquired by said district, and in acquiring such rights, the district may exercise the right of eminent domain."

■■ It is next contended that the various reclamation acts became incorporated into, and became a part of, the supplemental water right contracts, and that the provisions in those contracts limiting operation and maintenance charges to one dollar per acre were surplusage. Appellants rely upon the rule in 17 C. J. S. 782, § 330:

"Unless a contract otherwise provides, the law applicable thereto at the time of its making, including the law of the place where it is entered into, and the law of the place where it is to be performed, as the case may be, is as much a part of the contract as though it were expressed or referred to therein, for it is presumed that the parties had such law in contemplation when the contract was made."

And upon *Dopps v. Alderman,* 12 Wn. (2d) 268, 121 P. (2d) 388; *In re Kane,* 181 Wash. 407, 43 P. (2d) 619; and *Foss v. Golden Rule Bakery,* 184 Wash. 265, 51 P. (2d) 405. In *Dopps v. Alderman, supra,* we said:

"In accordance with a well-established rule, a statute which affects the subject matter of a contract, in contemplation of law, is incorporated into and becomes a part thereof, *provided, of course, that the statute is in effect at the time the contract is made."* (Italics ours.)

We have already pointed out that, prior to the enactment of the reclamation extension act of August 13, 1914, there was no provision in the Federal reclamation law upon which a charge for operation and maintenance could be based. The trial court aptly observed that no language could be found in this 1914 act making its provisions retroactive. We hold that, prior to August 13, 1914, there was no law in existence which would prohibit the entering into of the supplemental contracts.

■ It is next contended that the contract of January 3, 1945, between the government and the district, covers operation and maintenance of irrigation works after the same are transferred to water users to operate, and supersedes all contradictory provisions in former contracts. The trial court answered this contention by pointing out that the above contract was between the United States and the district; that the individual landowners were not parties

to the contract; and that the United States and the district could not, without the consent of the landowners, take from them existing rights which they already had. We are in accord with this reasoning.

■ It is contended that respondents, having failed to make objection to the toll and charge assessment roll before the board of equalization (in connection with the assessment roll levied by the board of directors of the irrigation district in the fall of 1945), are estopped to raise this question in this action. *Laycock v. Lake Chelan Reclamation Dist.*, 124 Wash. 544, 214 Pac. 1054, was an action to have assessments levied by the district canceled and declared void. We there said:

"The last question is whether the respondents had a right to maintain an action in equity to cancel these assessments. There is no provision in the law providing any other remedy and making it exclusive. It is the rule in this state that courts have the power by injunction to restrain the enforcement of an illegal tax upon real property and remove the apparent lien created by an invalid levy or assessment. *Northwestern Lumber. Co. v. Chehalis County*, 24 Wash. 626, 64 Pac. 787; *Spokane & Inland Empire R. Co. v. Spokane County*, 82 Wash. 24, 143 Pac. 307."

■ The trial court ruled that, after the passage of § 5 of the reclamation extension act of August 13, 1914, the secretary of the interior did not have the legal right to contract to deliver water for a charge of not to exceed one dollar per acre, and that such provisions in contracts executed subsequent to August 13, 1914, were surplusage. Respondents cross-appeal from this ruling. They recognize the rule that existing statutes, at the time the contract is made, become a part of it, and must be read into it; but contend that the reclamation extension act was enacted to apply only to projects constructed by the secretary under the reclamation act and had no application to those constructed by private enterprise and taken over by the United States.

The entire history of reclamation in the West demonstrates that the government was interested in developing waste land in this vast area. It recognized that these proj-

ects were too large and too costly to be handled exclusively by private enterprise, and decided that they could only be made successful under the guidance and financial assistance of the government. It took over old projects and enlarged them, and constructed new ones. They all became a part of this vast scheme. We are satisfied that any reclamation legislation enacted by Congress was directed to all projects operated by the government, whether such projects were constructed by it, or whether they were acquired from private companies.

The judgment, in its entirety, is affirmed.

MALLERY, C. J., BEALS, STEINERT, ROBINSON, SIMPSON, JEFFERS, and HILL, JJ., concur.

MILLARD, J. (dissenting)—The act of Congress which fixes the measure and the limit of the water right, controls over a contradictory provision in the contract, and may not be successfully challenged, in view of the opinion of the supreme court of the United States in *Ickes v. Fox,* 300 U. S. 82, 81 L. Ed. 525, 57 S. Ct. 412. The secretary of the interior was without authority to enter into a contract with a water user of a Federal reclamation project limiting the operation and maintenance charges to one dollar an acre, in view of the construction by the United States supreme court (*Swigart v. Baker,* 229 U. S. 187, 57 L. Ed. 1143, 33 S. Ct. 645) of the reclamation act of June 17, 1902.

The United States supreme court held that it was a condition prerequisite to the delivery of water, that operation and maintenance charges be paid. In other words, the act of Congress which fixes the amount to be paid for operation and maintenance, controls over a contradictory provision in a contract which limits the operation and maintenance charges to one dollar an acre.

It is a rule, which needs no citation of sustaining authority, that the statute, which was in effect when the contract was executed, became a part of the agreement.

February 18, 1948. Petition for rehearing denied.