The UNITED STATES of America, Plaintiff,

v.

ALPINE LAND & RESERVOIR CO., et al., Defendants.

Aqueduct I Ltd., Petitioner.

No. CV–D–90–190–PMP.

United States District Court, D. Nevada.

March 18, 1996.

Ross de Lipkau, Marshall, Hill, Cassas & de Lipkau, Reno, NV, for Petitioner Aqueduct I.

Fred R. Disheroon, U.S. Department of Justice, Land & Natural Resources Division, Washington, D.C., for Plaintiff.

Dale Ferguson, Woodburn & Wedge, Reno, NV, for Schwake–Leising Group.

David Creekman, Deputy Attorney General, Carson City, NV, for Nevada State Engineer.

## OPINION

PRO, District Judge.

Under the terms of the decree entered in *United States v. Alpine Land & Reservoir Co.,* 503 F.Supp. 877 (D.Nev.1980), Aqueduct I Ltd. ("Aqueduct") timely appeals from the Nevada State Engineer's Ruling # 4207 ("Ruling # 4207") which granted, subject to conditions, Change Applications for water usage filed by Aqueduct. For the reasons that follow, the Court affirms the decision of the State Engineer.

### I. Factual and Procedural History

In 1989, Aqueduct I Ltd. ("Aqueduct") purchased from Fred H. Dressler several acres of land in Alpine County, California and Douglas County, Nevada, with appurtenant surface water rights. Aqueduct also purchased Mud Lake Reservoir ("Mud Lake") and one-third of the storage rights in that reservoir. These water rights are subject to the decree entered by the United States District Court in *United States v. Alpine Land & Reservoir Co.,* CV–D–183 BRT (D.Nev.1980) ("Alpine Final Decree"). *See* Alpine Final Decree; *see also United States v. Alpine Land and Reservoir Company,* 503 F.Supp. 877 (D.Nev.1980), *modified,* 697 F.2d 851 (9th Cir.1983), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983).

The present dispute began when Aqueduct submitted change applications for water usage numbered 54729 through 54741 ("Change Applications") to the Nevada State Engineer ("State Engineer") on May 9, 1990. The Alpine Final Decree sanctions the use of Nevada law with regard to Change Applications. *See* Alpine Final Decree, Administrative Provisions, § VII ("[a]pplications for changes . . . as to Nevada shall be directed to the State Engineer").

Under Nevada law, an applicant may apply for three kinds of changes of a water right: (1) changes in place of diversion; (2) changes in manner of use; and (3) changes in place of use. *See* Nev.Rev.Stats. § 533.040 (water right may be severed/transferred); Nev.Rev.Stats. § 533.345(1) (requirement that every application for changes in place of diversion,

changes in manner of use, and changes in place of use contain certain information). These changes are not mutually exclusive and may be requested in any combination. *See* Nev.Rev.Stats. §§ 533.040 & 533.345.

Aqueduct's Change Applications sought to approve the transfer of surface irrigation rights Aqueduct owns on the upper Carson River into storage in Mud Lake Reservoir by changing the point of diversion, the place of use, and the manner of use of direct flow irrigation water rights decreed by the Court in the Alpine Final Decree.[1] Those water rights involve Claim Numbers 520 through 536, 542, 545, 546, and 553 of the Alpine Final Decree.

Aqueduct's one-third interest in the storage rights in Mud Lake are represented by Claim Numbers 814, 814a, and 463. These claims are not the subject of any Change Application.

On May 29, 1990, Aqueduct filed a motion requesting the Court approve the changes set forth in the Change Applications. This matter went to trial before the late Honorable Bruce R. Thompson in February 1992 but was not concluded due to the passing of Judge Thompson. The parties entered into a Stipulation, approved by this Court, which stipulated to certain facts and remanded certain issues in this case to the State Engineer. Among these issues to be resolved included whether Aqueduct's storage rights under Alpine Final Decree claim numbers 463, 814 and 814A may be used only to supplement Aqueduct's direct diversion rates it succeeded to and any other issues of fact or law which may be considered by the State Engineer. *See* Stipulation (# 82), filed January 28, 1993, and entered February 18, 1993.

The State Engineer held a Public Administrative Hearing on March 11, 1994. On July 25, 1995, the State Engineer issued Ruling # 4207 ("Ruling # 4207" or the "Ruling"). That Ruling granted Applications 54729 through 54738, subject to conditions,[2] and acknowledged that Applications 54739, 54740 and 54741 were withdrawn by Aqueduct.

On August 25, 1995, Petitioner Aqueduct filed a Complaint (# 114) and Notice of Appeal (# 115), challenging the State Engineer's Ruling # 4207. Presently before the Court is Aqueduct I Ltd.'s Opening Brief (# 120), filed October 3, 1995. Respondent State of Nevada filed its Answering Brief (# 121) on November 6, 1995. Respondent Schwake–Leising Group filed its Responding Brief (# 122) on November 6, 1995. Respondent the United States filed its responding brief styled "Reply Memorandum of the United States in Opposition to Appeal Regarding Water Rights Transfer Applications 54729–54721 by Aqueduct I Ltd" (# 125) on November 6, 1995. Respondent Pyramid Lake Paiute Tribe of Indians filed its Statement (# 127) urging affirmance on Novem-

---

1. The Alpine Final Decree provides that "[c]hange of manner of use applications from use for irrigation to any other use and changes in place of use applications shall be allowed only for the net consumptive use of the water right as determined by this Decree." Alpine Final Decree, Administrative Provisions, § VII. The Alpine Final Decree establishes that the net consumptive use of surface water for irrigation of the lands above the Lahontan Reservoir is 2.5 acre-feet per acre. Alpine Final Decree, Findings of Fact, § VIII. The State Engineer multiplied the consumptive use limitation by the number of acres being stripped of decreed water rights, 757.9 acres, to derive the total transferable consumptive use of the surface irrigation rights Aqueduct owns, 1,894.75 acre feet. *See* Ruling # 4207, p. 2. This means that the maximum amount of water Aqueduct may change from irrigation to storage purposes for later release for an unidentified beneficial use under the State Engineer's Ruling is 1894.75 acre feet annually.

2. The State Engineer conditioned his approval of Aqueduct's Change Applications on the following:

(1) existing rights;

(2) payment of statutory fees;

(3) installation of measuring devices at certain locations acceptable to the Federal Water Master and the State Engineer;

(4) Aqueduct may only store a maximum amount of 1894.75 acre-feet annually for later release for consumptive use;

(5) Aqueduct must file secondary applications for any release for consumptive use and additional losses will be assessed;

(6) Aqueduct shall not divert or store water except in an amount necessary to fulfill secondary uses;

(7) the approval is null and void if any attempt is made to drill wells and irrigate, from a groundwater source, the land being stripped of water.

*See* Ruling # 4207, p. 17.

ber 24, 1995. Aqueduct filed Replies (## 129, 130 & 131) on December 1, 1995. The Court heard oral argument on this matter on February 20, 1996.

In this appeal, Aqueduct asserts that (1) the State Engineer's Conclusion IX set forth in Ruling # 4207 was in error as the storage rights are not supplemental to other direct diversion rights; (2) the State Engineer lacked the appropriate authority to make attached conditions to the granting of the change applications; and (3) the State Engineer improperly required the transportation loss to be borne by Aqueduct.

## II. Jurisdiction

The Alpine Final Decree establishes that "[a]pplications for changes in the place of diversion, place of use or manner of use as to Nevada shall be directed to the State Engineer." Alpine Final Decree, Administrative Provisions, § VII. Pursuant to Nevada law, the State Engineer is appointed by and is responsible to the Director of the Nevada Department of Conservation and Natural Resources ("DCNR"), and performs duties prescribed by law, court decree, and by the Director of DCNR. These duties include administering the appropriation and management of Nevada's public waters under Nevada law. See Nev.Rev.Stats. §§ 533.010 to 534.190; see also Alpine Final Decree, Administrative Provisions, § VII. Nevada law governs the manner in which the State Engineer reviews change applications. See Nev.Rev.Stats. § 533.370.

Under the decree, "[a]ny person feeling himself aggrieved by any order or decision of the State Engineer on these matters may appeal that decision or order to this Court." Alpine Final Decree, Administrative Provisions, § VII. Accordingly, this Court acts as an appellate court for decisions of the State Engineer with regard to federally decreed water rights. See Alpine Final Decree, Administrative Provisions, § VII; see also United States v. Alpine Land & Reservoir Co., 697 F.2d 851, 858 (9th Cir.1983), cert. denied, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983) (approving this jurisdictional arrangement in which the federal district court reviews actions of the Nevada State Engineer).

## III. Standard of Review

■ The Alpine Final Decree, in accordance with Nevada law, establishes that "[t]he decision of the State Engineer shall be prima facie correct, and the burden of proof shall be upon the party challenging the Engineer's decision." See Alpine Final Decree, Administrative Provisions, § VII; see also Nev.Rev.Stats. § 533.450(9). The Alpine Final Decree does not establish a specific standard of review the Court should undertake when reviewing decisions of the State Engineer, but the parties agree that the Court should employ a deferential standard. Accordingly, the Court will review the evidence under a deferential standard and will sustain the State Engineer's decision if substantial evidence supports the decision and the decision is not an abuse of discretion, and if the decision is not contrary to law. See Office of State Engineer, Division of Water Resources v. Curtis Park Manor Water Users Ass'n, 101 Nev. 30, 692 P.2d 495, 497 (1985); see also Town of Eureka v. Office of State Engineer, Division of Water Resources, 108 Nev. 163, 826 P.2d 948, 949 (1992).

## IV. Water Stored in Mud Lake under Claim Nos. 463, 814 and 814A

Aqueduct first contends that the State Engineer erred in concluding that the water stored in Mud Lake under Aqueduct's Claim Nos. 463, 814 and 814A are supplemental to the direct diversion rights.[3] Aqueduct as-

3. Conclusion IX states as follows:

The water stored in Mud Lake Reservoir under the Aqueduct I portions of Claim No's. 463, 814 and 814A, was historically used to supplement the irrigation of unspecified Dressler (now Aqueduct I) lands, on which a direct diversion water right existed. The State Engineer concludes that the Aqueduct I portion of the storage rights (Claim No's. 463, 814 and 814A) are supplemental to Aqueduct I direct diversion rights and these storage rights may not be separated from the direct diversion rights. The State Engineer further concludes the delivery of the full consumptive use of 2.5 acre feet per acre requires both the Aqueduct I direct diversion rights and the Aqueduct I portion of the storage rights under Claim No's. 463, 814 and 814A. Therefore, the State Engi-

serts that its share of water decreed under Alpine Final Decree numbers 463, 814 and 814A and stored in Mud Lake is "prime," not "supplemental," and therefore independent from, and in addition to, direct diversion rights under the decree. According to Aqueduct, the transferable consumptive use amount of the surface irrigation rights on the upper Carson River is separate from and additional to the storage rights Aqueduct already owns in Mud Lake. If Aqueduct prevails, Aqueduct may combine the transferable consumptive use with the existing allowed storage rights to state a purported total amount of water that Aqueduct could use for municipal water supply. This would deplete the Carson River and limit the downstream supply reaching Lahontan Reservoir. As it stands under the State Engineer's Ruling, the storage rights and direct diversion rights cannot be separated. *See* Ruling # 4207.

Aqueduct asserts that the State Engineer erred because (1) based on water usage, the water stored in Mud Lake cannot be considered supplemental; and (2) Mud Lake is treated differently under the Alpine Final Decree so that the waters of Mud Lake cannot be considered supplemental.

### A. Water Usage

■ The State Engineer found that "the water under the Aqueduct I portion of Claims 463, 814, and 814a was stored for the supplemental irrigation of Dresslers' (now Aqueduct I's) decreed lands but was not appurtenant to any particular parcel of land." Ruling # 4207, Finding of Fact VI, p. 7. The State Engineer based this finding on the historical practices of the Dresslers, since the rights under Claim Nos. 463, 814 and 814a are described in the Alpine Final Decree as

"reservoir rights" and no place of use is associated with them. *Id.*

The Ruling reads as follows:

Historically, this water [Claim Nos. 463, 814 and 814A] was entirely used by the Dresslers to supplement the irrigation of portions of their property on which direct diversion water rights under the Alpine Decree were appurtenant. The priorities of the water rights that are the subject of this ruling range from 1863 to 1913. Late dated priorities would be cut off very early in the summer. The stored water enabled the Dresslers to irrigate later in the summer when their land may have been out of priority.

Ruling, Finding of Fact VI, p. 7. The State Engineer concluded that since priorities would be cut off, it was necessary for the Dresslers to utilize storage water to obtain a full season supply. *Id.* Accordingly, the State Engineer reasoned that the Mud Lake storage rights could not be separated from the direct diversion rights. *See* Ruling # 4207, Conclusion IX, p. 15.

■ Aqueduct asserts that the waters of Mud Lake were never utilized on the real property owned by Aqueduct, contrary to the State Engineer's finding.[4] Aqueduct relies on testimony from several individuals at the hearing.

Mr. Mahannah, the engineer for Truckee–Carson Irrigation District ("TCID"), testified that the water from Mud Lake cannot be physically moved for irrigation purposes to the property Aqueduct owns (formerly owned by the Dresslers) because it is uphill (*i.e.,* Mud Lake is located downstream from the irrigated land which Aqueduct purchased). Due to this fact, it is impossible to irrigate directly the land Aqueduct purchased with Mud Lake storage water.

---

neer concludes that the maximum quantity of water to be stored in Mud Lake Reservoir under Applications 54729 through 54738 and Aqueduct I's portions of Claim No's. 463, 814 and 814A is 1894.75 acre feet.
Ruling # 4207, Conclusion IX, p. 15 (emphasis added).

4. Aqueduct asserts that the State Engineer should not have decided whether the waters of Mud Lake were placed to a beneficial use on the Dressler property since Aqueduct's share of Mud

Lake waters (Claim Nos. 463, 814 and 814A) were not the subject of a Change Application, and thus the finding amounts to an inappropriate advisory opinion. However, the Court remanded these issues pursuant to Stipulation and Order (# 82) to the State Engineer and the State Engineer had to make this factual finding in order to determine the extent of the direct diversion rights. The Court finds no merit to Aqueduct's contention.

Mr. Garry D. Stone, the Federal Water Master, testified that previous owners diverted water pursuant to Claim Nos. 814 and 814a prior to the irrigation season during winter and early spring. Mr. Stone further testified that the Dresslers would release water from Mud Lake to irrigate land on higher ground which is now owned by others, and that the Dresslers would use an "exchange" process in which lower users on the West Fork of the West Carson River who were entitled to other water would "exchange" that water with the Dresslers for water from Mud Lake. Mr. Stone then stated his opinion that he did not consider the water stored under Claims 814 and 814a to be appurtenant to any property. This opinion was echoed in the affidavit of Mr. Roland D. Westergard, a former Nevada State Engineer who qualified as an expert in the proceedings before Judge Thompson. Aqueduct contends that the testimony of these individuals indicate that this water was not used on property owned by the Dresslers and therefore cannot be considered supplemental.

However, Mr. Stone did state that "[a]ny of the water that was released from Mud Lake was used to irrigate land that had direct diversion water rights from the Carson River" and that Mud Lake was managed "to allow the Dresslers to utilize the full storage in Mud Lake on their land." Furthermore, Finding of Fact 6(d) in the Alpine Final Decree states that "[t]he water stored in Mud Lake Reservoir is sometimes released to downstream users in exchange for direct diversion that would normally go to those downstream users." [5] Alpine Final Decree, Finding of Fact 6(d). Dressler lands upstream from Mud Lake did receive the benefit of Mud Lake storage waters as a result of exchange practices. Further, Aqueduct admits that the Dresslers did use Mud Lake waters to irrigate various portions of the entire Dressler property across and downstream from the reservoir. The State Engineer could properly find that the Dresslers used Mud Lake to supplement their irriga-

tion of parts of their decreed irrigation acreage, and that the waters of Mud Lake were supplemental to direct diversion rights.

■ Moreover, accepting Aqueduct's assertions would contradict established principles of Nevada water law. A water right is the "right to divert water ... for beneficial use from a natural spring or stream." *Application of Filippini,* 66 Nev. 17, 202 P.2d 535, 537 (1949). Indeed, Nevada water law requires that water be put to a beneficial use. Nev.Rev.Stats. § 533.030. A beneficial use is the basis of a water right. Nev.Rev.Stats. § 533.035. To the extent that Aqueduct asserts that its rights are pure storage rights with no other manner of use, the storage of water alone, absent an underlying beneficial use, is not a valid appropriation and water right. *See Prosole v. Steamboat Canal Co.,* 37 Nev. 154, 140 P. 720, 722 (1914) (superseded by statute on other grounds) (mere diversion into a canal, without any further application, does not create a water right as there is no attendant beneficial use); *see also* Nev. Rev.Stats. § 533.530 (it is unlawful to "divert and conduct the water, or portion thereof, of any river, creek, or stream into any slough, dam or pond and retain, or cause the water to be held or retained therein, without making any other use of the water").

Furthermore, to the extent that Aqueduct asserts that its storage rights are not based on its direct diversion rights, the Court finds this assertion meritless. Under the established tenet that a beneficial use is the measure and limit of a water right, *see* Nev.Rev. Stats. § 533.035, when the necessity for the use of water ceases to exist or is reduced, the extent of the water right is limited to the extent of the beneficial purpose which remains. Nev.Rev.Stats. § 533.045. This principle is stated in the Alpine Final Decree:

> The quantities of water to be diverted by the owners of the several ditches, through those ditches, on account of the several priorities herein allowed, are allowed subject to the obligations of said owners to

---

**5.** The Alpine Final Decree sanctions the use of historical customs and practices in the administration of the river. *See* Alpine Final Decree, Finding of Fact X; *see also Alpine,* 503 F.Supp. at 891 ("[t]his Court approves and adopts the

customs, practices, agreements and decrees set forth in the Decree; the Water Master is directed to include these practices in his administration of the river").

divert and use water only at such times as needed and only in such amounts as may be required for actual, reasonably economical beneficial use.

Alpine Final Decree, Administrative Provisions, § IV. Aqueduct admitted that water in Mud Lake was beneficially used as supplemental irrigation water by stipulating that "[t]he storage water owned by Aqueduct in Mud Lake Reservoir has been used for irrigation purposes on land with appurtenant water rights adjudicated by the Final Decree." Stipulation and Order (# 82). The limit of that water right is its beneficial and historical use for irrigation of lands with a direct diversion right. Therefore, the State Engineer did not err in finding that Mud Lake storage rights are not separate and distinct from the direct diversion rights they supplement.

### B. Treatment under the Alpine Final Decree

■ Aqueduct asserts that Mud Lake is treated differently from other rights considered supplemental under the Alpine Final Decree. The Alpine Final Decree, as well as the Order by Judge Thompson accompanying the decree and set forth at *United States v. Alpine Land & Reservoir Co.*, 503 F.Supp. 877 (D.Nev.1980) sets forth two categories of reservoirs. One is the alpine or high mountain reservoir, and the other is the storage reservoir (such as Ambrosetti Pond, and those found along the Allerman Canal). Aqueduct asserts that the Alpine Final Decree treats the alpine lakes differently than other reservoirs: the alpine reservoirs on both the West and the East Forks of the Carson River are not appurtenant to any place of use. *See* Alpine Final Decree, Finding of Fact X(4) ("[t]raditionally the water stored in the mountain reservoirs has not been considered appurtenant to any particular place of

use"). If Mud Lake were an alpine or mountain reservoir, it would follow that it would not be appurtenant to any place of use. The State Engineer found that Mud Lake was not an alpine or high mountain reservoir.[6] Aqueduct contends the contrary is correct.

Aqueduct first asserts that the filling of Mud Lake is made "out of priority" and it thus qualifies as a high alpine or mountain reservoir. However, the Alpine Final Decree establishes that high alpine reservoirs are filled out of priority order "because the snow does not melt sufficiently at those high elevations to fill the reservoirs until the summer when the river flow has already begun to diminish down in the valley." Alpine Final Decree, Finding of Fact X(1)(f). In contrast, Mud Lake is filled during the fall, winter, and spring. Alpine Final Decree, Claim No. 463. These different filling times distinguish Mud Lake from the high alpine or mountain reservoirs.

■ Aqueduct next asserts that the water released from Mud Lake is not appurtenant to any particular place of use based on a previous ruling by the State Engineer regarding Ambrosetti Reservoir. In Ruling # 3703, based upon the evidence before him at that time, the State Engineer concluded that Ambrosetti Reservoir is the "one exception" to the general rule that water in most Alpine Final Decree reservoirs is not appurtenant to any particular parcel of land. Aqueduct asserts that this means that Mud Lake is a typical reservoir that is not appurtenant to any particular parcel of land. However, Ruling # 3703 is an unrelated ruling, with no *res judicata*, collateral estoppel, or *stare decisis* effect. The Court finds this assertion meritless.

■ Aqueduct next asserts that the State Engineer impermissibly discriminates between water represented by corporate own-

---

**6.** The State Engineer's Finding with regard to this issue states as follows:

Mud Lake Reservoir can be distinguished from the high mountain lakes. The high alpine reservoirs on both forks of the Carson River are filled out of priority because the snow melt doesn't begin at the higher elevations until the flow has diminished on the Valley Floor. Additionally, in the decree, the water stored in the mountain reservoirs in Segment 3 is not appurtenant to any particular place of use. The State Engineer finds that Mud Lake Reservoir is not in Segment 3 and is not a mountain reservoir. Therefore, it shall be filled according to priority and the water stored in Mud Lake shall be appurtenant to particular places of use as described by future secondary permits.

Ruling # 4207, Finding of Fact IX, pp. 9–10.

ership and water that is not, and impermissibly discriminates between Mud Lake and other reservoirs that are not "appurtenant to any particular place of use." The State Engineer found that Mud Lake did not qualify as an alpine or mountain reservoir since it did not qualify as a Segment 1 or Segment 3 reservoir.[7] *See* Ruling # 4207, Finding of Fact IX, pp. 9–10. The Alpine Final Decree states that Segment 1 reservoirs are high alpine reservoirs whose water "is represented by corporate stock, and is rented, traded and sold to any landowner." Alpine Final Decree, Finding of Fact X(2). Aqueduct asserts that whether or not Mud Lake was ever owned by a corporation should not be enough to place it outside of a category like Segment 1. To the extent that Aqueduct is challenging the Alpine Final Decree's division of the Carson River and its tributaries into eight segments, the Court finds this challenge meritless as Aqueduct cannot now revisit that ruling. To the extent that Aqueduct is challenging the State Engineer's placement of Mud Lake outside of Segment 1 or Segment 3 reservoirs, the Court rejects Aqueduct's argument as the Alpine Final Decree itself places Mud Lake in Segment 5.

Aqueduct finally asserts an argument based on construction of the terms of the Alpine Final Decree. Aqueduct maintains that the decree specifically refers to a "supplemental right" with regard to Claim Nos. 464 and 459, but no such mention is made with regard to Claim No. 463, Mud Lake. Aqueduct states that if Judge Thompson meant to make waters of Mud Lake supplemental, he would have put it in the decree. However, even without the express mention of Mud Lake as supplemental, any other use violates the terms of the Alpine Final Decree. The decree restrains all claimants, including successors, from "asserting . . . any right in or to the waters of the Carson River or its tributaries, or the waters of any of the creeks or streams or other waters mentioned . . . except in accordance with the rights specified, determined and allowed by this Decree." Alpine Final Decree, Administrative Provisions, § III. The decree also establishes the maximum annual amount of wa-

ter that can be delivered to land to which decreed water rights are appurtenant. This amount is referred to as the "duty." Water in Mud Lake, if it were applied to property to which full duties are already assigned, would violate the provision that the "water duties assigned for the various categories of the land are the total duties from whatever source of surface water." Alpine Final Decree, Finding of Fact VIII. Any conclusion other than the conclusion that Mud Lake supplements direct flow rights would violate the terms of the decree. The Court therefore finds Aqueduct's contention meritless.

The Court also rejects the remaining contentions of Aqueduct. The State Engineer did not err in finding that Mud Lake is not a high alpine or mountain reservoir. As substantial evidence exists for the State Engineer's conclusion that the waters of Mud Lake are supplemental to Aqueduct's direct diversion rights, the Court will affirm this finding.

## V. Conditions on Granting Aqueduct's Change Applications

In his Ruling # 4207, the State Engineer granted the subject applications but imposed a number of conditions upon them. *See supra* n. 2. Aqueduct contests two of them. Aqueduct contests the State Engineer's requirement that the approval of Aqueduct's Change Applications would be null and void if an attempt were made to drill wells and irrigate, from a groundwater source, the land being stripped of water. Aqueduct also contests the State Engineer's requirement that Aqueduct bear transmission loss.

### A. Wells Drilled in California

The water that is the subject of this action flows from California, across Woodsford Gauge, downstream in the West Fork of the Carson River, across the California–Nevada border and is diverted from the West Fork and placed to a beneficial use in Nevada. The State Engineer approved Aqueduct's Change Applications so long as no irrigation wells are drilled in California to irrigate land.

---

**7.** For administrative and management purposes, the Alpine Final Decree divides the Carson River into eight separate and distinct segments. Alpine Final Decree, Findings of Fact, ¶ IX.

Aqueduct asserts that the State Engineer had no authority to issue this condition.

■ Under Nevada law, the State Engineer must consider several factors in ruling on a Change Application, including whether the change would impair existing rights. Nev.Rev.Stats. § 533.370(3). While the Nevada Supreme Court has not expressly addressed the issue of the authority of the State Engineer to condition his approval of an application to appropriate, the New Mexico Supreme Court has reasoned that a state engineer may properly impose suitable conditions on granting applications as inherent in the broader statutory authority vested in the state engineer to deny applications if they impair existing water rights. *City of Albuquerque v. Reynolds*, 71 N.M. 428, 379 P.2d 73, 81 (1962) (*"Reynolds"*).

The Court finds *Reynolds* applicable to the instant case. The Nevada State Engineer has the inherent authority to condition his approval of an application to appropriate based on his statutory authority to deny applications if they impair existing water rights. *See Reynolds*, 379 P.2d at 81; *see also* Nev.Rev.Stats. § 533.370(3). The Court finds inapposite the case cited by Aqueduct as that case dealt only with the *res judicata* or conclusive effect on pre-existing water rights of a permit issued by the State Engineer, and did not address the State Engineer's authority to condition the approval of an application on the occurrence or non-occurrence of a future event. *See Salmon River Canal Co. v. Bell Brand Ranches, Inc.*, 564 F.2d 1244, 1246 (9th Cir.1977), *cert. denied*, 436 U.S. 918, 98 S.Ct. 2264, 56 L.Ed.2d 758 (1978).

■ The State Engineer concluded that a hydrologic link exists between the area's groundwater resource and the Carson River's flow such that when groundwater is tapped, the river's water level is lowered to the detriment of downstream users. Ruling # 4207, Finding of Fact XIV, pp. 12–13. The State Engineer based this conclusion on findings in a report prepared by the United States Geological Survey. *Id.* The State Engineer could properly take administrative notice of this report. *See* Nev.Rev.Stats. § 233B.123(5).

Groundwater development is not directly impacted by this decision. Indeed, the Nevada State Engineer cannot regulate groundwater development in California and does not purport to do so in Ruling # 4207. However, if it occurs in order to irrigate land stripped of water rights by the approval of Aqueduct's applications, Nevada's interests are protected by the State Engineer's decision. The Court finds Aqueduct's assertion meritless. This condition is a proper exercise of the State Engineer's authority in granting change applications and the Court will affirm it. *See Reynolds*, 379 P.2d at 81.

## B. Transportation Loss

■ In granting Aqueduct's applications the State Engineer determined that "[t]here would be a relatively large transportation loss from the proposed point of diversion on the West Fork [of the Carson River] to Mud Lake." Ruling, Finding of Fact XII, p. 11. The State Engineer determined that this transmission loss would occur because the distance between Aqueduct's proposed diversion covers a distance of about eight miles, whereas historically the diversions were adjacent to the place of use. *Id.* The State Engineer therefore determined that Aqueduct should bear the entire loss for all water placed into storage during the irrigation season. *Id.* Aqueduct asserts that this determination was erroneously based upon a conclusion that a loss would occur by the transportation of additional water.

Ruling # 4207 is concerned with general transportation loss during the irrigation season from the proposed point of diversion to Mud Lake. The State Engineer, in exercising his authority under Nev.Rev.Stats. § 533.370(3) and in recognizing his obligation to protect downstream users, provides through Ruling # 4207 that as the party seeking to modify its existing rights, Aqueduct shall bear the transportation loss attributable to Aqueduct's change, as measured by the measuring devices at the point of diversion and at the point where water enters Mud Lake. If no transportation loss occurs, Aqueduct will not bear any loss under the Ruling. This condition is a proper exercise

of the State Engineer's authority in granting change applications. *See Reynolds*, 379 P.2d at 81.

The State Engineer's Ruling # 4207 is supported by substantial evidence, and there are no errors of law.

IT IS THEREFORE ORDERED THAT the findings of fact and conclusions of law entered by the Nevada State Engineer in Ruling # 4207 are AFFIRMED.